**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GINA VASOLI,** <br>         **Plaintiff,** | **CIVIL ACTION** |
|    **v.** | |
| **YARDS BREWING COMPANY, LLC,** <br> **AND TREVOR PRICHETT,** <br>         **Defendants.** | **NO.  21-2066** |

## OPINION

Plaintiff Gina Vasoli accepted a marketing job at Defendant Yards Brewing Company, LLC ("Yards") in 2013.  Yards began to experience financial difficulties in 2017, due to decreasing sales and a construction project that ran millions over budget.  In July 2019, Plaintiff informed her supervisors that she was pregnant.  After this revelation, she began to see a significant decrease in her workload.  Two months later, and two days after complaining to her supervisor about her lessened responsibilities, Plaintiff was terminated by the CEO, Trevor Prichett.[1]  On May 5, 2021, she filed this lawsuit against Yards and Prichett (collectively, "Defendants") asserting claims of discrimination and retaliation on the basis of sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951, *et seq.* ("PHRA"); and the Philadelphia Fair Practices Ordinance, Phila. Code, § 9-1101, *et seq.* ("PFPO").[2]  For the reasons that follow,

---

[1] On October 3, 2019, Plaintiff filed a complaint of discrimination with the Pennsylvania Human Relations Commission ("PHRC") which she cross-filed with the Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII.  On October 27, 2020, the PHRC issued a Case Closure Notification and a Finding of No Probable Cause.  The EEOC adopted the PHRC's findings.  Both agencies issued a right-to-sue letter.

[2] Specifically, the Amended Complaint asserts that Yards violated Title VII, the PHRA, and the PFPO through acts of discrimination and retaliation, and that Prichett aided and abetted Yards' alleged violations of the PHRA and the PFPO.

Defendants' Motion for Summary Judgment will be granted in part and denied in part.

## I.   FACTUAL BACKGROUND

Plaintiff wore many hats at Yards.  Between February 1, 2013, when she first joined the company, and her termination in 2019, her role encompassed, at various times, graphic design, social media, public relations, communications, design production, human resources, and project management.  In recognition of her work, Defendants gave her a raise in March 2019.  Although she started out as the only marketing employee at Yards, in 2015 two employees joined the marketing team under her supervision: Corey Fox and Ben Lackey (who initially split his time between marketing and sales).

Yards' financial struggles began in late 2017.  The company had been constructing a new facility, to which it eventually relocated its operations.  But construction ran almost $5 million over budget, forcing Yards to take on new debt to cover costs.  Almost simultaneously, Yards began to feel the negative effects of rising competition in the craft brewing industry.  Sales decreased by 5% from 2017 to 2018 and by 8% from 2018 to 2019.  The company reported a net loss of over $1.5 million in 2018, and a net loss of $1.1 million in the first half of the 2019 fiscal year.

In the midst of this downturn, sometime in 2018, Prichett was promoted from Chief Operating Officer to Chief Executive Officer and the Marketing Department was expanded. Lackey began devoting all of his time to marketing, and Prichett created two new full-time positions, hiring Brandt Imhoff as Senior Graphic Designer and Lou Tumolo as Chief Marketing Officer.  Both Tumolo and Imhoff were paid more than Plaintiff.  After these staffing changes, the Department was reorganized so that Plaintiff, Fox, Lackey, and Imhoff each reported directly to Tumolo.

But Yards soon ran into problems with Tumolo's performance.  Sales continued to drop and all four of his subordinates testified to problems with his leadership and management.  In June 2019, Prichett called up Chris Hancq, a business development manager at Yards, and told him that he had decided to terminate Tumolo—whether because of poor performance or the company's financial straits is disputed.  Prichett asked Hancq to take over supervision of the Marketing Department until a long-term solution could be found.  Hancq agreed.

Shortly after that call, Prichett terminated Tumolo.  Initially, Plaintiff took over Tumolo's responsibilities on her own initiative, but Hancq took over leadership not too long after.

On July 9, Plaintiff met with Prichett and Hancq and asked for a leadership position in the Marketing Department.  Their response to Plaintiff's request was "essentially, that they were figuring stuff out."  By the time of this meeting, both men knew about Plaintiff's pregnancy.[3] Over the next two months, job responsibilities were taken away from Plaintiff, including project management, point of sale, and public relations.  Hancq took on at least some of these responsibilities.  No other employee in the Marketing Department had their scope of work decreased during this time.

On July 13, 2019, Prichett contacted the Brownstein Group, a third party contractor, to discuss a plan for Yards' "marketing/creative structure."  Based on discussions between Prichett and the Brownstein Group that August, Hancq understood that Yards might outsource certain marketing functions and remove staff from that department.  Specifically, Hancq testified that the Brownstein Group recommended that Yards would have no need for a project manager or

---

[3] Plaintiff told Prichett that she was pregnant shortly after Tumolo's termination, around June 27, 2019.  The record contains conflicting testimony about when Hancq was told.  Hancq testified that he already knew Plaintiff was pregnant when Prichett asked him to take over the Marketing Department in June, but Plaintiff testified that she told Hancq on or about July 9.  For purposes of this Motion, the difference in timing is immaterial.

full-time designer.

On September 3, 2019, Plaintiff sent Hancq an email with the subject line

"Understanding my role and responsibilities," which stated in part:

> I'd like to meet with you to better understand my current role and how it
> will take shape going forward. Of immediate concern is the significant
> reduction in my workload and responsibilities over the past two months.
> If we're still in the transition period you and Trevor spoke about back in
> July, then I'm happy to continue to help wherever I'm needed in the
> interim, and I'd like to discuss how my time and skills can be best utilized
> during the remainder of the transition.

Hancq forwarded the email to Prichett, but did not answer it.  Plaintiff followed up on September

4, but Hancq still did not answer.

Prichett terminated Plaintiff on September 5, having decided to do so a day or so earlier.

Prichett told Plaintiff that the company was in a "very challenging financial circumstance" and

had to eliminate her position.  She was then making $64,000 annually.  She was the only woman

in the Marketing Department and had worked there the longest.  Prichett offered Plaintiff eight

weeks' severance, conditioned on her release of any claims against Yards.[4]  Imhoff was

terminated the same day and received two to four weeks of unconditional severance.

On October 1, 2019, Yards outsourced certain marketing functions to the Brownstein

Group for a monthly fee of $25,000, under a payment plan that allowed Yards to make only one

payment in 2019.  Hancq testified that this contract effectively outsourced all of Yards'

marketing functions except social media and events, which continued to be handled in-house by

---

[4] Prichett testified that he did not recall whether, in order to receive the severance, Plaintiff would have to sign a
release, but that it was possible.  For the purposes of summary judgment, it may be inferred in the non-movant's
favor that Plaintiff's severance offer was conditional: (1) Prichett offered Plaintiff eight weeks' severance;
(2) Prichett asked Plaintiff, after her termination, if she wanted to "move forward" with the offered severance; (3) if
Yards wanted to pay the severance without a release, it could have just done so, it would have had no need to
discuss anything with her; (4) when asked why Yards would not give Plaintiff severance until she signed a release,
Prichett testified that he did not recall.

Fox and Lackey.  Hancq also continued to work on marketing tasks until his separation from Yards in 2021, but the record is unclear as to what his role was.

Soon after her termination, Plaintiff began looking for work.  A few weeks after she was termination, Tumolo reached out to her about a new project, but Plaintiff declined to work with him.[5]  Between September 2019 and March 2020, she applied for a job as a dog walker and for a position at the Census Bureau.  In September 2020, she was hired as a part-time retail manager at a children's clothing and supply store, which became a full-time position later that autumn.

## II.   LEGAL STANDARDS

To prevail at summary judgment, "the movant must show that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Nat'l State Bank v. Fed. Reserve Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992) (quoting Fed. R. Civ. P. 56(c)).  A factual dispute is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

The movant bears the initial burden of identifying those portions of the record "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Then, the non-moving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324.  Courts must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original)

---

[5] The Parties dispute whether Tumolo made an "offer" of employment.

(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*)).  "This standard is applied with added rigor in employment discrimination cases."  *Stewart v. Rutgers Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (quoting *Robinson v. PPG Indus. Inc*., 23 F.3d 1159, 1162 (7th Cir. 1994)).

### III.    DISCUSSION

#### A.  Exhaustion

As a preliminary matter, Defendants allege that Plaintiff did not exhaust her administrative remedies under the PHRA because she did not submit a rebuttal brief, did not respond to a request for information from the PHRC, and did not appear for an interview with the PHRC.

The PHRA "establish[es] administrative remedies and procedures that claimants must exhaust prior to bringing a civil action in court."  *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001) (citing 43 Pa. Stat. Ann. § 962(c)).  This exhaustion requirement serves a policy of "resolv[ing] discrimination claims administratively through cooperation and voluntary compliance in an informal, noncoercive manner."  *Id*.

To exhaust her remedies, the complainant must participate in the PHRC's investigation in good faith.  *Lukus v. Westinghouse Elec. Corp.*, 419 A.2d 431, 454 (Pa. Super. 1980).  Courts generally defer to the agency's findings in this regard.  Thus, "if an agency reaches the merits of a claim, despite a claimant's failure to comply with requests for information, administrative remedies should be presumed sufficiently exhausted to permit suit in federal court."  *Jasch v. Potter*, 302 F.3d 1092, 1095-96 (9th Cir. 2002); *see also id.* at 1094 (collecting cases); *Wilson v. Peña,* 79 F.3d 154, 164-65 (D.C. Cir. 1996) (complainant who fails to provide sufficient

6

information has nevertheless exhausted remedies if the agency takes final action on the merits).[6]

By contrast, if the agency dismissed the case due to the complainant's lack of cooperation, then the claims are barred for failure to exhaust. *See Kozlowski v. Extendicare Health Servs., Inc.*, 2000 WL 193502, at *2 (E.D. Pa. Feb. 17, 2000) (EEOC closed case because the plaintiff had "failed to cooperate to the extent that it was not possible to resolve [her] charge" (alteration in original)); *Gazzerro-Langford v. Shinseki*, 2013 WL 125675, at *3 (E.D. Pa. Jan. 9, 2013) (agency dismissed claims because plaintiff's failure to cooperate prevented it from assessing the merits); *McLaughlin v. State System of Higher Educ.*, 1999 WL 239408, at *2 (E.D. Pa. Mar. 31, 1999) (EEOC closed case for failure to cooperate).

Under these precedents, Defendants' challenge to Plaintiff's good faith stumbles. The PHRC did not close Plaintiff's case due to a failure to cooperate. The PHRC indicates why it is closing a case by selecting a reason from a set list of reasons contained in the Case Closure Notification form. One of the options the PHRC may choose is "Complainant failed to cooperate with one or more aspects of the investigation." The PHRC did not select that option here. Instead, the only reason given for closing Plaintiff's case was that "[t]here was insufficient

---

[6] Although the Third Circuit has not yet decided whether a court can find that a plaintiff failed to cooperate with an agency's investigation into a complaint of discrimination absent an agency finding to that effect, it agreed with the Ninth Circuit's reasoning about deference to agency findings when making exhaustion determinations in the context of an appeal from the Board of Immigration Appeals ("BIA"). In *Lin v. Att'y Gen. of United States*, the Third Circuit held that the BIA's decision to rule on a given issue *sua sponte*, even though the petitioner had not raised it with specificity, did not mean that the petitioner had failed to exhaust his administrative remedies, because the agency had apparently determined that the issue was sufficiently presented to be adjudicated on the merits. 543 F.3d 114, 124 (3d Cir. 2008) (citing *Sidabutar v. Gonzales*, 503 F.3d, 1116, 1119 (10th Cir. 2007)). The Court then cited the following language from *Jasch*: "[w]hen an agency proceeds to reach the merits of the case rather than dismiss the claim . . . , it has determined that sufficient information exists for such adjudication. After all, the agency itself is in a strong position to evaluate whether the complainant has sufficiently complied with [the agency's] requests." *Id*. at 124-25 (citing *Jasch*, 302 F.3d at 1095). Based on this reasoning, the Third Circuit concluded that the purposes underlying the exhaustion doctrine had been served because the BIA had issued a decision on the merits, availing itself of the "opportunity to apply its experience and expertise without judicial interference." *Id*. at 125. Therefore, the Court declined to reject the petition for review on grounds deemed inapplicable by the BIA. *Id.*

evidence to establish discrimination."[7]  This important detail distinguishes Plaintiff's situation

from the cases cited by Defendants, which all involved administrative dismissals based on a

failure to cooperate.  *See Kozlowski*, 2000 WL 193502, at *2; *Gazzero-Langford*, 2013 WL

125675, at *3; *McLaughlin*, 1999 WL 239408, at *2.

The PHRC is the expert decision-making body designated by the Pennsylvania legislature

to investigate complaints of discrimination.  *Lukus*, 419 A.2d at 454-55; 43 Pa. Stat. Ann.

§ 957(f).  As the Pennsylvania Supreme Court has remarked:

> When the Legislature has seen fit to enact a pervasive regulatory scheme
> and to establish a governmental agency possessing expertise and broad
> regulatory and remedial powers to administer that statutory scheme, a
> court should be reluctant to interfere in those matters and disputes which
> were intended by the Legislature to be considered, at least initially, by the
> administrative agency.

*Feingold v. Bell of Pa.*, 383 A.2d 791, 793 (Pa. 1977).  *See also Rideout v. Pub. Opinion*, 2011

WL 321104, at *6 (M.D. Pa. Jan. 28, 2011) (the "cure" for plaintiffs who receive a right-to-sue

letter despite failing to "actively participate in the administrative process" is "not for a federal

court to rewrite Pennsylvania laws" but either a statutory amendment or "for the PHRC to more

assiduously police the complaints filed before it by dismissing complaints or commencing failure

to cooperate proceedings before issuing 'right to sue' notices"); *Wheeler v. Voicestream Wireless*

*Servs.*, 2005 WL 1240797, at *4 (M.D. Pa. May 24, 2005) (where the PHRC did not terminate its

investigation for failure to cooperate, "the Court simply cannot say that Plaintiff prevented the

---

[7] Nor does the record support Defendants' assertion that the PHRC "note[d] Plaintiff's lack of cooperation in its final decision" by stating that "[s]everal attempts . . . to obtain a rebuttal and evidence . . . were unsuccessful."  This language appears in the decision two times.  Each time, it appears immediately after the PHRC's finding that its investigation uncovered no evidence that Plaintiff had complained to Defendants about gender- or pregnancy-based discrimination.  In other words, the decision ties the PHRC's failed attempts to obtain more evidence not to a failure to cooperate but to the PHRC's given reason for closing the case: insufficient evidence.  Nor did the PHRC's failure to obtain more evidence prevent it from evaluating Plaintiff's claims on the merits—the decision weighs the evidence and concludes that there was no probable cause to believe Plaintiff had suffered discrimination.

PHRC from adjudicating her complaint").

The PHRA's decision to close the case for a reason other than a failure to cooperate necessarily means that Plaintiff's cooperation was sufficient for the purposes of satisfying the exhaustion requirement. Therefore, Plaintiff has exhausted her administrative remedies.[8]

### B. Discrimination

Turning now to the merits of Plaintiff's discrimination claims, it is unlawful under Title VII for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also* 43 Pa. Stat. Ann. § 955(a) (corresponding provision of the PHRA); Phila. Code § 9-1103 (corresponding provision of the PFPO).[9] The term "sex" includes "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k); *see also* 43 Pa. Stat. Ann. § 954(t) (extending protection to "any person who is pregnant"); Phila. Code § 9-1103(1) (defining "sex" to include "pregnancy, childbirth, or a related medical condition").

Because Plaintiff relies on circumstantial evidence to prove her case, the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015). Under the first step of the *McDonnell Douglas* framework, the employee bears the burden of establishing a *prima facie*

---

[8] This holding applies to Plaintiff's PFPO claims as well, as that statute contains an implicit exhaustion requirement that may be satisfied by filing a complaint with the PHRC. *Marriott Corp. v. Alexander*, 799 A.2d 205, 208 (Pa. Commw. 2002). Furthermore, the EEOC adopted the PHRC's findings, such that Plaintiff has exhausted her administrative remedies under Title VII.

[9] Plaintiff's discrimination claims under Title VII, the PHRA, and the PFPO are analyzed together. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (discrimination claims under Title VII and the PHRA are interpreted co-extensively); *Joseph v. Cont'l Airlines, Inc*., 126 F. Supp.2d 373, 376 n.3 (E.D. Pa. 2000) (analyzing PFPO claims under Title VII standard).

case of discrimination.  *Burton v. Teleflex Inc*., 707 F.3d 417, 426 (3d Cir. 2013).  "[T]he burden

of production [then] shifts to the defendant to offer a legitimate non-discriminatory [justification]

for the adverse employment action."  *Id.* (first alteration added) (quoting *Smith v. City of

Allentown*, 589 F.3d 684, 690 (3d Cir. 2009)).  In the third and final step, "the burden of

production [shifts] back to the plaintiff to provide evidence from which a factfinder could

reasonably infer that the employer's proffered justification is merely a pretext for

discrimination."  *Id.*  Plaintiff bears the burden of persuasion at every step of the analysis.  *St.

Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

### i.     The **Prima Facie** *Case*

To establish a prima facie case of pregnancy discrimination, the plaintiff must show

(1) "she is or was pregnant and that her employer knew she was pregnant"; (2) "she was

qualified for her job"; (3) "she suffered an adverse employment decision"; and, (4) "some nexus

between her pregnancy and her employment termination that would permit a fact-finder to infer

unlawful discrimination."  *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365-66 (3d Cir. 2008).

"The burden of making this showing is not onerous."  *Young*, 575 U.S. at 228 (internal quotation

marks omitted) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  "In

particular, making this showing is not as burdensome as succeeding on an ultimate finding of

fact as to a discriminatory employment action."  *Id.* (internal quotation marks omitted) (quoting

*Furnco Constr. Co. v. Waters*, 438 U.S. 567, 576 (1978)).  The plaintiff need only raise a

genuine dispute of material fact as to each of the elements of the *prima facie* case.  *Burton*, 707

F.3d at 426.

Defendants challenge Plaintiff's *prima facie* case only under the fourth element: nexus.

As explained in this Court's Opinion denying Defendants' Motion to Dismiss, nexus may be

established in a variety of ways, including the temporal proximity between the pregnancy and the adverse act; disparate treatment compared to those similarly situated; a pattern of antagonism; or inconsistent explanations for the adverse action.  *Vasoli v. Yards Brewing Co.*, 2021 WL 2808823, at *3 (E.D. Pa. July 6, 2021) (collecting cases).  "[C]ausation can also be established holistically 'based upon review of all proffered evidence.'"  *Id*. (quoting *Ahern v. Eresearch Tech., Inc.*, 183 F. Supp.3d 663, 669 (E.D. Pa. 2016)).

Plaintiff has mustered evidence of a causal nexus sufficient to make out a *prima facie* case.  She asserts that she was treated disparately compared to similarly situated male employees in four instances: (1) when she requested a leadership position in the Marketing Department, that position was given to Hancq instead; (2) in the two months after she announced her pregnancy and requested a leadership position, responsibility was taken away from her and not from her male colleagues; (3) she was terminated and two male colleagues, who had less experience and seniority, were not; and, (4) she was offered severance conditional on signing a release of claims, while Imhoff, who was fired the same day, received unconditional severance.

Plaintiff also points to a temporal nexus, in that her working conditions changed after she announced her pregnancy—although she received a good performance review and a raise in recognition of her hard work in March 2019, her supervisors began taking work away from her within weeks of learning about her pregnancy in June or July 2019.  Furthermore, Plaintiff notes that, prior to mid-2018, the Marketing Department had consisted of Plaintiff supervising Fox and Lackey; after the termination of Tumolo and Imhoff, instead of returning to the prior staffing model, Defendants chose to replace Plaintiff with Hancq.  Plaintiff also points to broader contextual evidence, in that no woman has ever sat on Yards' leadership team and all of the board members are men.

11

Finally, Plaintiff attacks Prichett's motives, citing to his testimony that (1) generally, it could be disruptive for a company when an employee goes on leave; (2) an employee going out on leave could create a headache for the manager who has to deal with work assignments and schedules and make sure that everything that that employee handles gets done; (3) pregnancy could be a distraction and generally, people focus better when they do not have personal distractions; and, (4) sometimes, it is generally easier for employees to be more flexible in connection with their work hours, or to arrive early or stay late, when they do not have young kids at home.[10]

Defendants dispute many of these facts.  For example, they contend that Tumolo and Imhoff were fired at the same time as Plaintiff and for the same financial reason; that Fox and Lackey are not similarly situated to Plaintiff; and that Hancq, like Plaintiff, was required to sign a release of claims in order to receive severance pay when he separated from Yards in 2021.  But these contentions reveal why Defendants cannot prevail on summary judgment: the record is replete with genuine disputes of material fact.  In light of the Parties' competing record evidence, and viewing the facts and drawing inferences in Plaintiff's favor, a reasonable fact-finder could find that Plaintiff has shown causal nexus.  Therefore, Plaintiff has made out a *prima facie* case.

### ii.    The Non-Discriminatory Reason

The employer's burden of proffering a legitimate non-discriminatory reason for its conduct is "relatively light" and "is satisfied if the employer provides evidence, which, if true,

---

[10] Defendants argue that Prichett's testimony on this point must be disregarded because counsel objected to the form of the question.  Defendants cite to no case law in support of this argument—perhaps none could be found.  An argument without citation to legal authority may properly be disregarded.  Eastern District of Pennsylvania Local Rule 7.1(c).  Defendants also argue that the fact that Plaintiff had taken maternity leave in 2017 and "worked for several years without any performance issues undercuts" her reliance on this portion of Prichett's testimony.  But what happened the first time Plaintiff took maternity leave has little bearing on whether discrimination occurred the second time or on Prichett's general views about how personal distractions may affect employee performance.

would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426.  "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'"  *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

Defendants have carried their burden of production.  They have pointed to record evidence that, from 2017 through Plaintiff's termination, Yards' sales were trending downwards even as it was forced to take on millions of dollars in new debt in order to cover significant costs related to an over-budget construction project.  Prichett testified that the Marketing Department was the only area where Yards could afford to lay off employees, due to the nature of their responsibilities; that it laid off Tumolo, Plaintiff, and Imhoff to save money; and that when Lackey resigned in December 2019, he was not replaced for the same reason.  He testified that Plaintiff was terminated because she was one of the highest-paid employees in marketing and her role could be outsourced.  He further testified that the Brownstein Group provided Yards with the support it needed at the right price.  Taken as true, this evidence permits the conclusion that Plaintiff was terminated for a non-discriminatory financial reason.

### iii.    *The Evidence of Pretext*

To show that Defendants' explanation is pretextual, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  "[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

prudent, or competent." *Id*. at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id*. (alteration in original) (emphasis in original) (internal citation omitted) (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)).

Plaintiff calls Defendants' financial justification for her termination into question by citing witness testimony that conflicts with Prichett's financial explanation for Tumolo's termination. Yards' Office Manager, Peter Kasper, testified that Tumolo's termination was due to poor performance. Specifically, Kasper testified that Tumolo "wasn't a good manager" and that "deadlines were often missed or pushed because the structure wasn't there and that was his responsibility." Similarly, Imhoff testified that Tumolo "had a lot going on in his personal life and it tended to bubble up at work" and that he had "witnessed friction" between Tumolo and Prichett. Imhoff also testified that it was sometimes hard to report to Tumolo because it was difficult to get Tumolo to focus on a particular issue and Tumolo would sometimes change his mind about matters on which he had already given direction. Lackey agreed that some of Tumolo's personal issues impacted his work and testified that Tumolo and Prichett would "butt heads occasionally on business decisions." Fox testified that Tumolo was "not cut out for" the role of Chief Marketing Officer and was unable to lead the marketing team. Fox testified that Tumolo's involvement in the Marketing Department made it ineffective, unfocused, and unable to complete projects. This testimony conflicts with Prichett's version of events and raises a genuine dispute of fact as to the reason Tumolo was terminated. That fact is material because Defendants rely on Tumolo's termination to show a pattern of financially-motivated

terminations, including Plaintiff's.

Plaintiff next raises inconsistencies in the story about Yards' financial issues.  Plaintiff points out that, according to Prichett, Yards' financial troubles worsened in late 2017 and continued through 2019.  Yet, during that time, Prichett added two full-time hires to the Marketing Department (Tumolo and Imhoff).  Tumolo earned more than twice Plaintiff's salary and Imhoff was paid $1,000 per year more than her.  Furthermore, Plaintiff testified that, based on a managers' meeting in July 2019, she had understood that the company's financial situation was improving, which weakens the financial justification for terminations after that time.  This record evidence of inconsistencies in Yards' response to its financial situation and the message it conveyed to its managers raises a genuine dispute of material fact about whether finances actually motivated Plaintiff's termination.[11]

Finally, Plaintiff points to evidence that Yards had no guardrails in place to prevent discrimination.  Prichett testified that, as of July 2021, Yards had never done any employee anti-discrimination or anti-retaliation training.  He himself had never had any such training.  Kasper testified that no anti-discrimination policy had ever been distributed to employees.  And as of 2019, no one at Yards was responsible for ensuring that termination decisions were made without regard to protected characteristics.  Certainly, this testimony does not cast Defendants in

---

[11] Plaintiff also argues that Defendants' interrogatory response that "there was no longer a Marketing Department" after her termination is contradicted by record evidence showing that Fox, Lackey, and Hancq remained in the Marketing Department after her termination.  (For example, Kasper testified that Hancq shifted most of his time from business development to marketing after Plaintiff's termination, and that Hancq continued to spend time on marketing until his separation from Yards in early 2021.)  Despite their interrogatory responses, Defendants no longer take the position that the Marketing Department ceased to exist; their position now is that all of marketing was outsourced *except* social media and events, which were handled by Fox and Lackey.  Defendants' change in position and the fact that Hancq remained involved in the Department after Plaintiff's departure together create a genuine dispute of fact about what responsibilities remained in-house after Plaintiff's termination and whether any of them had previously belonged to Plaintiff.  This dispute is material because Prichett testified that Plaintiff was terminated because her role could be outsourced.

a flattering light.  It is not clear, however, how this evidence could show pretext and Plaintiff

cited no case law where lackadaisical anti-discrimination measures showed pretext.  She appears

to argue that evidence of Defendants' failure to take action to ensure that bias did not factor into

its decisions creates a genuine dispute of material fact about whether discrimination was actually

a factor in her termination.  This argument is not persuasive.  Discrimination may, theoretically,

be more likely to occur in a company that does nothing to prevent it, but that risk could not cause

a reasonable juror to disbelieve Defendants' justification for terminating Plaintiff because it does

not evince discriminatory intent.[12]

Nevertheless, considering the record as a whole, a reasonable juror could disbelieve

Defendants' proffered justification for firing Plaintiff and summary judgment will be denied as

to her discrimination claim.

### C.  Retaliation

"Title VII's anti-retaliation provisions protect employees who participate in Title VII's

statutory processes or who otherwise oppose employment practices made illegal by Title VII."

*Curay-Cramer v. Ursuline Acad. Wilmington, Del., Inc.,* 450 F.3d 130, 134 (3rd Cir. 2006).

"Under the *McDonnell Douglas* framework, a plaintiff asserting a retaliation claim first must

establish a prima facie case by showing: '(1) [that she engaged in] protected employee activity;

---

[12] Plaintiff also argues that the fact Defendants have no documentation of the decision to terminate her is evidence of pretext.  While that may be true in some cases, Plaintiff has not explained why that would be so here, where the decision was made by only one person.  Furthermore, the cases cited by Plaintiff for this argument are distinguishable because in those cases the lack of documentation specifically undermined the professed reason for the adverse employment action.  *See Johnson v. Verizon Servs. Corp.*, 2017 WL 1397240, at *4 (E.D. Pa. Apr. 18, 2017) (dispute of fact existed where only documentation of criteria used to evaluate employees for reduction-in-force had been destroyed); *Eno v. Lumberman's Merch. Corp.*, 2012 WL 1344394, *6 (E.D.Pa. Apr. 18, 2012) (lack of evidence of plaintiff's "contentiousness," in light of uniformly positive performance evaluations, established pretext).  Here, Defendants have provided documentation of Yards' financial circumstances, and it is undisputed that Plaintiff was among the highest-paid employees in marketing.  The fact that no additional evidence ties the company's financial circumstances to Plaintiff's termination specifically is not a persuasive indicator of pretext.

(2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Daniels v. Sch. Dist. Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).[13]

Plaintiff alleges that she engaged in protected activity on September 3, 2019, when she emailed Hancq and raised concern about "the significant reduction in my workload and responsibilities over the past two months." Defendants argue that because this email made no reference to Plaintiff's pregnancy, it does not constitute "protected employee activity."

The definition of "protected employee activity" encompasses "informal protests of discriminatory employment practices, including making complaints to management." *Curay-Cramer*, 450 F.3d at 135 (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). But a "general complaint of unfair treatment is insufficient." *Id.* A complaint amounts to "protected employee activity" only if it "identif[ies] the employer and the practice—if not specifically, at least by context." *Id.* The complaint must either "explicitly or implicitly allege[] that a protected characteristic was the basis for the adverse employment action." *Id.* (internal quotation marks omitted).

Plaintiff's internal complaint is akin to that rejected by the Third Circuit in *Barber v. CSX Distrib. Servs.*, 68 F.3d 694 (3d Cir. 1995). In *Barber*, the Third Circuit held that a plaintiff who complained internally about being passed over for a promotion, without mentioning age discrimination specifically, did not engage in "protected employee activity." *Id.* at 701-02; *see also Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283 (3d Cir. 2010) (complaint

---

[13] The retaliation standard is the same for Title VII, the PHRA, and the PFPO. *See Daniels*, 776 F.3d at 192-93 (treating Title VII and PHRA retaliation claims the same); *Tomaszewski v. City of Phila.*, 460 F. Supp.3d 577, 599 (E.D. Pa. 2020) (treating Title VII, PHRA, and PFPO retaliation claims the same).

about being "discriminated against, harassed, and bullied" too vague to constitute protected activity).  Similarly, in her September 3 email, Plaintiff complained that her responsibilities had decreased, but she did not explicitly "allege that a protected characteristic was the basis" for that adverse action.  *Curay-Cramer*, 450 F.3d at 135.

Nor does Plaintiff's email contain an implicit allegation of discrimination based on a protected characteristic.  *Id*.  Plaintiff asserts that the phrase "the past two months" was a veiled reference to her pregnancy, because she had informed Prichett and Hancq of it approximately two months earlier.  But this phrase is too vague to support that implication.  Plaintiff's announcement of her pregnancy was not the only event of note to occur approximately two months before she sent the email—Tumolo was terminated, Hancq stepped into his role temporarily, projects were paused—the Marketing Department was in disarray.  Indeed, the next sentence of Plaintiff's email states: "If we're still in the transition period you and [Prichett] spoke about back in July, then I'm happy to continue to help wherever I'm needed in the interim."  This sentence links her complaint not to information she provided to Prichett and Hancq (her pregnancy), but to something they told her (they were in a transition period).

To make an implicit complaint of discrimination based on a protected characteristic, more is needed.  For example, a reasonable person could discern an allegation of discrimination based on national origin from an employee's complaint that she had been the target of comments regarding her accent and food. *Jajua v. Diakon Lutheran Soc. Ministries*, 299 F. Supp.3d 645, 657 (E.D. Pa. 2018).  By contrast, Plaintiff's email contains no information from which a pregnancy discrimination allegation could reasonably be understood—it is just a general protest about the change in her working conditions.[14]

---

[14] Plaintiff argues that her email to Hancq was not impermissibly vague because Prichett agreed that, *if* the phrase

Viewed as a whole, Plaintiff's email to Hancq is not "specific enough to notify management of the particular type of discrimination at issue in order to constitute protected activity." *Sanchez*, 362 F. App'x at 288 (citing *Barber*, 68 F.3d at 702). While Plaintiff may have chosen her words wisely from a professional relations perspective, the email does not provide a sufficient legal basis for a claim of retaliation because it is not "possible to discern from the context" of the message that Plaintiff was voicing opposition to an "unlawful employment practice." *Curay-Cramer*, 450 F.3d at 135. Therefore, the September 3 email does not constitute protected employee activity and Plaintiff's retaliation claim must be dismissed.[15]

### D.  Mitigation

A plaintiff alleging discrimination "is subject to the statutory duty to minimize damages." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982).[16] The duty to mitigate "requires the claimant to use reasonable diligence in finding other suitable employment." *Id*. A failure to mitigate damages could foreclose an award of back pay and/or front pay. *Ford Motor Co.*, 458 U.S. at 231-32; *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 86 (3d Cir. 2009).

Failure to mitigate is an affirmative defense for which the defendant bears the burden of proof. *Anastasio v. Schering Corp.*, 838 F.2d 701, 707 (3d Cir. 1988). A defendant may satisfy

---

"the past two months" was "intended" to refer to the date on which Plaintiff disclosed her pregnancy, "then it would be reasonable to construe the email as making a complaint of pregnancy discrimination." But Plaintiff's subjective intent in sending the email is irrelevant. *Curay-Cramer*, 450 F.3d at 137. "It is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative." *Id.* While Plaintiff may have intended to communicate a complaint of pregnancy discrimination, when "viewed objectively," her email cannot be said to have "achieve[d] that goal." *Id*.

[15] Defendants did not move for summary judgment on Plaintiff's aiding and abetting claims. However, as the retaliation claims will be dismissed, the claims that Prichett aided and abetted retaliation must necessarily be dismissed as well. *See* 43 Pa. Stat. Ann. § 955(e); Phila. Code. § 9-1103(h). Analogously, her claim that Prichett aided and abetted discrimination survives because the underlying claim against Yards survives.

[16] While *Ford Motor Co.* concerned only Title VII, the duty of mitigation attaches under the PHRA as well. *See Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x. 4, 10-13 (3d Cir. 2005) (applying Title VII mitigation standard to PHRA claims).

this burden by proving that other substantially equivalent positions were available and plaintiff did not exercise reasonable diligence to secure them.  *Id*. at 708.  "Substantially equivalent employment is that employment which affords *virtually identical* promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated."  *Booker v. Taylor Milk Co*., 64 F.3d 860, 866 (3d Cir. 1995) (emphasis added) (quoting *Sellers v. Delgado Coll.*, 902 F.2d 1189 (5th Cir. 1990)).  "Generally, a plaintiff may satisfy the 'reasonable diligence' requirement by demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment."  *Id*. at 865.  A lack of reasonable diligence may be established by a showing that the plaintiff "has withdrawn from the employment market."  *Tubari, Ltd., Inc. v. NLRB*, 959 F.2d 451, 454 (3d Cir. 1992).

Defendants assert that Plaintiff entirely withdrew from the job market because (1) Tumolo offered her a work opportunity and she turned it down; and, (2) she has applied to only three jobs since her termination.

Defendants have not carried their burden.  They have not put forward any evidence that the offer made by Tumolo was for a substantially equivalent position because they presented no evidence at all of the position's "promotional opportunities, compensation, job responsibilities, and status."  *Booker*, 64 F.3d at 866.[17]  Nor have Defendants offered any evidence showing that, by applying to three jobs in the course of a year, Plaintiff was not exercising "reasonable diligence."  The Third Circuit has decreed that "[t]he reasonableness of a Title VII claimant's

---

[17] Defendants argue that they have "no obligation . . . to show the availability of any substantially equivalent position" because withdrawal from the job market "is an alternative means of establishing a failure to mitigate."  This argument is unavailing.  Defendants contend that Plaintiff should have accepted Tumolo's job offer.  Given that plaintiffs only have the obligation to accept substantially equivalent jobs, *Ford Motor Co.*, 231-32, Defendants must show that Tumolo's offer was for a substantially equivalent job.

diligence should be evaluated in light of the individual characteristics of the claimant and the job market." *Booker*, 64 F.3d at 866.   Defendants advanced no arguments at all about Plaintiff's characteristics or job market conditions from September 2019 to September 2020.   Their conclusory assertion that there is "no other way to define" the record evidence "than as withdrawal from the job market" is not evidence that can be weighed against their burden of proof.   And their argument that "Plaintiff makes no attempt to show that she took any steps to find comparable employment" must be rejected because the duty to mitigate is an affirmative defense and Defendants cannot prevail on summary judgment by foisting their burden onto Plaintiff.

For these reasons, as to mitigation, Defendants have not shown that "there is no genuine dispute as to any material fact and [they are] entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**